IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANGELA Y.,[1]                                    No. 3:17-cv-01954-HZ

                        Plaintiff,              OPINION & ORDER

        v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                        Defendant.


Lisa R.J. Porter
J.P. LAW P.C.
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035

        Attorney for Plaintiff

Renata Gowie
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Martha A. Boden
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Angela Y. brings this action for judicial review of the Commissioner's final

decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"). This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by

42 U.S.C. § 1382(c)(3)). The Commissioner's decision is reversed and remanded for further

proceedings.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB and SSI on December 12, 2013, alleging disability as of August

12, 2010. Tr. 104–05.[2] Plaintiff amended her onset date to October 9, 2012, at the hearing. Tr.

20, 48. Plaintiff's date last insured ("DLI") is December 31, 2015. Tr. 104–05. Her application

was denied initially and on reconsideration. Tr. 189–93, 195–216. On May 4, 2016, Plaintiff

appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 46. On

June 2, 2016, the ALJ found Plaintiff not disabled. Tr. 37. The Appeals Council denied review.

Tr. 1.

## FACTUAL BACKGROUND

      Plaintiff initially alleged disability based on bipolar disorder, agoraphobia, depression,

chronic pain, fibromyalgia, migraines, arthritis, asthma, allergies, irritable bowel syndrome, and

"neck/spine/skull" pain. Tr. 343. She was 37 at the time of her amended alleged onset date and

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative
record, filed herein as Docket No. 11.

41 at the time of the administrative hearing. Tr. 36. Plaintiff has a high school education and past relevant work experience as a pharmacy technician. Tr. 36.

## SEQUENTIAL DISABILITY ANALYSIS

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. *See, e.g., Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. 137 at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot

perform past relevant work, the burden shifts to the Commissioner. In step five, the

Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden

and proves that the claimant is able to perform other work which exists in the national economy,

the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her amended alleged onset date of October 9, 2012. Tr. 22. Next, at steps two and

three, the ALJ determined that Plaintiff has the following severe impairments: "fibromyalgia;

migraines/headaches; irritable bowel syndrome; obesity; and asthma." Tr. 22. However, the ALJ

determined that Plaintiff's impairments did not meet or medically equal the severity of a listed

impairment. Tr. 24. At step four, the ALJ concluded that Plaintiff has the residual functional

capacity to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) with the

following limitations:

> [T]he claimant can frequently push and pull with the bilateral upper extremities;
> can frequently climb ramps and stairs; can occasionally climb ladders, ropes, and
> scaffolds; can occasionally stoop, kneel, crouch, and crawl; should avoid
> concentrated exposure to extreme cold, vibration and hazards (such as
> unprotected heights and exposure [to] moving mechanical parts); should avoid
> even moderate exposure to fumes, odors, dusts, gases and poor ventilation; can
> understand and remember simple instructions; has sufficient concentration,
> persistence, and pace to complete simple, routine tasks for a normal workday and
> workweek with normal breaks; should have only occasional contact with general
> public and coworkers; should have no over the shoulder supervision; and should
> be in a workplace with few changes to the work setting.

Tr. 23. Because of these limitations the ALJ concluded that Plaintiff could not perform her past

relevant work as a Pharmacy Technician. Tr. 36. But at step five the ALJ found that there are

jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as

"Folder," "Marker," and "Assembler of Small Products I." Tr. 36–37. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 37.

**STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than preponderance." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The reviewing court may not substitute its judgment for that of the Commissioner. *Id.* (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id.*; *see also Batson*, 359 F.3d at 1193. However, the court cannot not rely upon reasoning the ALJ did not assert in affirming the ALJ's findings. *Bray*, 554 F.3d at 1225-26 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

**DISCUSSION**

Plaintiff contends that the ALJ erred by: (1) improperly discrediting Plaintiff's subjective symptom testimony; (2) giving partial weight to the opinion of examining licensed psychologist, Keli Dean, Psy.D; and (3) giving little weight to the opinion of Jeremy Adversalo, LPC. Pl. Op.

Br. 19–26, ECF 12. Because the Court finds the ALJ erred in giving partial weight to the opinion of Dr. Dean, this case is reversed and remanded for further proceedings.

**I.        Credibility Determination**

The ALJ is responsible for determining credibility.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  In assessing a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929. The first stage is a threshold test in which the claimant must present objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage of this analysis, absent affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin.,* 533 F.3d 1155, 1166 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at 1036.

The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Ghanim v. Colvin,* 763 F.3d 1154, 1163 (9th Cir. 2014); *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in the testimony. *Ghanim*, 763 F.3d at 1163; *Tommasetti*, 533 F.3d at 1039. In addition, conflicts between a claimant's testimony and the objective medical evidence in the record can undermine a claimant's credibility. *Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

When the ALJ's credibility findings are supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). However, a general assertion that plaintiff is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Morgan,* 169 F.3d at 599.

Plaintiff has severe impairments of "fibromyalgia, migraines/headaches, irritable bowel syndrome, obesity, and asthma." Tr. 22. She also alleged disability based on bipolar disorder, agoraphobia, and depression. Tr. 343. Plaintiff testified that she has pain in her neck, shoulders, back, hips, knees, ankles, fingers, and toes. Tr. 66. She has a hard time standing for more than 15-20 minutes and struggles with sitting and walking. Tr. 356. She cannot type or write for long without cramping, numbing, and tingling in her hands and fingers. Tr. 356. She has frequent migraines, which can last all day and are so painful she cries. Tr. 68–69. She also gets nauseous and must lay in a dark room to "get through it." Tr. 68. She struggles with concentration, time management, and mood swings, which affect her interactions with others and the quality of her work. Tr. 356. Plaintiff testified that she is unable to work because she is "unreliable" and "never know[s] from day to day if [she is] going to be able to walk from the bed to the bathroom, if [she can] get down the stairs or back up them, if [she is] going to wake up with a migraine, or end up developing a headache or migraine throughout the days it goes on [sic]." Tr. 52. She cancels commitments frequently because she is sick. Tr. 53.

At the time of the hearing, Plaintiff had three children, aged 3, 6, and 21. Tr. 49. Her family primarily relies on her husband's income and food stamps, tr. 49, but Plaintiff has made attempts to earn additional income. After her alleged onset date, Plaintiff earned $6 an hour by

babysitting for a friend. Tr. 51. She said it "did not go well," and she only earned $50 total. Tr. 51. She also made $500 over eight months as a fitness coach for "Beach Body Fitness." Tr. 51–52. According to Plaintiff, in this role she gave people words of encouragement and tried to motivate people to work out and eat healthier. Tr. 52. At the time, she was trying to improve her own diet and exercise and "encourage people along with her." Tr. 52.

Plaintiff identifies herself as a "stay-home mom" and tries to do chores around the house. Tr. 60. But her husband takes on the bulk of the household responsibilities, including most of the cooking, cleaning, laundry, grocery shopping, meal-planning, caretaking, and household management. Tr. 61, 363. Her oldest son, parents, and mother-in-law will help with cleaning and babysitting if Plaintiff is sick with a migraine. Tr. 363.  She grocery shops alone once per month. Tr. 63–64. On a "really, really great day" she can assist her kids in picking out their clothes, get her six-year-old son to the bus stop, empty half the dishwasher, and do a load of laundry before her husband gets home from work. Tr. 61. She prepares meals—such as peanut butter and jelly sandwiches and cold cereal—four to six times per week and snacks three times per week. Tr. 62, 369. Though she tries to vacuum, her six-year old often does it instead. Tr. 62. She also struggles with personal care. One of her mental health goals is to shower daily and regularly take care of personal hygiene. Tr. 62. She otherwise just "keep[s] her children safe" and helps her six-year-old with his homework. Tr. 62.

Plaintiff testified that she drives "zero to three times" per week. Tr. 50. Whether and how often she drives depends on whether she needs to go to the pharmacy, doctor's appointments, or drop something off at her son's school. Tr. 50. But she generally does not drive unless her husband is with her. Tr. 50. Because she avoids going out alone, they often run errands and attend doctor's appointments as a family. Tr. 360

In terms of hobbies, Plaintiff enjoys drawing, coloring, and sewing. Tr. 63. She is also interested in genealogy. Tr. 63. But she testified that all her hobbies now require more energy than she has, so she struggles to finish things. Tr. 63. Consequently, she engages "minimally" in these hobbies, and her art skills are at a "kid level" now. Tr. 63, 376.

The ALJ generally found that the "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 28. The ALJ gave three reasons in support of her credibility finding: (1) inconsistencies with Plaintiff's daily activities; (2) Plaintiff's responsiveness to treatment; and (3) the lack of support from the objective medical evidence. Plaintiff contends that these reasons are neither clear nor convincing. Pl. Br. 19; Pl. Reply Br. 2–7, ECF 16. Because the ALJ's finding that Plaintiff's conditions improved with treatment is clear and convincing and supported by substantial evidence, the Court finds that the ALJ did not err in discounting Plaintiff's credibility.

A.      Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti*, 533 F.3d at 1039. There are two grounds for using daily activities to form the basis of an adverse credibility determination: (1) when activities meet the threshold for transferable work skills and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007). However, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," *Reddick*, 157 F.3d at 722, and "the mere fact that a plaintiff has carried on with certain daily activities, such as grocery shopping . . . does not in any way detract from his credibility," *Webb v. Barnhart,* 433 F.3d 683, 688 (9th Cir. 2005) (citing *Vertigan v. Halter,* 260

F.3d 1044, 1050 (9th Cir.2001)). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick,* 157 F.3d at 722. The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his conclusion on the claimant's credibility. *Id.* at 722–23.

The ALJ found that Plaintiff's activities of daily living were inconsistent with the degree of limitation she alleged. Specifically, the ALJ cited Plaintiff's ability to take care of her children, manage their daily schedules, drive, and attend a co-op preschool with other mothers and children. Tr. 29. The ALJ emphasized that Plaintiff desired to have a fourth child, and she noted Plaintiff did not express any concern about her ability to provide for her children with her impairments and was willing to cease taking her medications while pregnant. Tr. 30. Indeed, the ALJ contends that "[i]t was not until the claimant needed disability paperwork completed that she told her treating provider that she was not always able to care for her children[.]" Tr. 30. The ALJ also emphasized that Plaintiff was working in 2015 selling a weight loss shake system, babysitting, attending church, researching her family history, and interacting with friends. Tr. 30. She enjoyed crafts and sewing, and she wanted to do the "beach body workout." Tr. 30.

The ALJ's reasoning here is not clear or convincing. First, the ALJ fails to specifically identify which of Plaintiff's alleged limitations conflict with these activities. Second, many of the cited activities do not conflict with Plaintiff's allegations. For example, Plaintiff's interest in doing a "beach body workout" and the fact that she enjoys crafts and sewing do not suggest that Plaintiff can do these activities. Rather, Plaintiff stated in her disability report and elsewhere that she has been limited in many of her daily activities because of her impairments. *See* tr. 63, 376, 1303 (treatment note indicating difficulty attending a friend's baby shower and inability to do any art projects over the past two weeks). Similarly, Plaintiff's attempt to babysit part-time,

limited work as a fitness coach, and ability to research her family tree are consistent with her

testimony that the symptoms from her physical and mental conditions wax and wane. *See* tr. 52,

(testifying that she doesn't know "from day to day" what her physical capacity will be), 61

(testifying that she had a greater capacity for household chores when she has "really good days"),

356 (noting the severity of her pain varies from day to day and week to week). In other words,

Plaintiff's ability to occasionally sit at a computer for a few hours to research her family tree

does not undermine her credibility.

Finally, Plaintiff should not be penalized for attempting to lead a personal and family life

in the face of her disabilities. The ALJ discounted Plaintiff's credibility in-part because Plaintiff

interacted with friends, attended church, benefitted from a church support group, and took care

of her children. Tr. 29–30 (citing tr. 1300, 1320, 1335). But one "need not vegetate in a dark

room to be eligible for benefits." *Molina*, 674 F.3d at 1112–13 (internal citations and quotations

omitted). In addition, contrary to the ALJ's finding, Plaintiff on several instances expressed

concerns about how to care for her children before she sought paperwork for her disability

application from her treating provider in March of 2016. Tr. 106 (chart note from November 21,

2012, indicating Plaintiff had previously been able to manage taking care of her kids but was

now "finding it harder to motivate"), 976 (note on January 9, 2014 that she "feels like she is not

taking care of her children as well as she had in the past"), 1301 (note on January 1, 2016 that

she struggles to maintain household structure). Accordingly, the Court finds that this is not a

clear or convincing reason for discounting Plaintiff's testimony.

B.       Response to Treatment

The ALJ may consider the effectiveness of treatment in rendering his credibility

determination. *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) ("Factors that the

adjudicator may consider when making . . . credibility determinations include . . . effectiveness or adverse side effects of any pain medication[.]"). In *Tommasetti v. Astrue*, for example, the plaintiff "did not seek an aggressive treatment program and did not seek an alternative or more-tailored treatment program after he stopped taking an effective medication due to mild side effects." 533 F.3d at 1039. There, the court held that the ALJ's inference that the plaintiff's pain was not totally disabling was reasonable. *Id.*; *see also Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (emphasizing that the medical evidence established the plaintiff had a good response to treatments for his underlying impairments). However, because "[c]ycles of improvement and debilitating symptoms are a common occurrence, . . . it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). Reports of improvement "must . . . be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id.*

Here, the ALJ noted that "[t]he claimant's treatment records show active participation and gradual improvement in symptoms with a month of intensive treatment." Tr. 28. Despite continuing to have some symptoms, the ALJ found that the reported symptoms "were not demonstrative of a person who is disabled by cognitive or social limitations." Tr. 28. During her intensive treatment, Plaintiff found group therapy helpful, practiced her CBT skills, walked, worked with her church group, and interacted well with family. Tr. 28. The ALJ emphasized that Plaintiff's therapy sessions after intensive treatment in 2014 were largely focused on her home life. Tr. 29. In 2015 and 2016, the ALJ found that the claimant had some periods of increased symptoms related to life stressors, but "her mood typically returned to baseline[.]" Tr. 29.

The ALJ's interpretation of the record is reasonable and supported by substantial evidence. After her intensive treatment in December of 2013, Plaintiff indicated that she was "experiencing depression and anxiety, which [was] affecting her ability to function effectively at home." Tr. 968. She still struggled with personal care and was not doing housework. Tr. 962, 976. She said that if she didn't have children, "she would isolate in her room." Tr. 962. Her sleep was very poor. Tr. 962. But a year later, she reported significant improvement with the resolution of several personal stressors. Tr. 1335. She reported successfully taking care of herself and her children, the ability to go into stores alone, and starting a co-op preschool with another mother. Tr. 1335. She still had anxiety, but it was not "horrible." Tr. 1335.

At most of her appointments in 2015 and 2016, her therapist observed that Plaintiff's mood was euthymic. Tr. 1295–1342. Plaintiff frequently reported she was doing well and that her mood was "okay" or "good." Tr. 1295–1300, 1312–17, 1320–21, 1324–35, 1341–42. At those appointments where Plaintiff reported increased mental health symptoms, she also reported situational stressors such as her husband's legal issues, stress from the holidays, her miscarriage, and the loss of her grandmother. Tr. 1299, 1301–05, 1319, 1322–23, 1326 (reporting increased symptoms at appointments in June of 2015, September of 2015, December of 2015, January of 2016, and April of 2016). Based on the record, it was reasonable for the ALJ to find that Plaintiff's symptoms were situational during this period. *See Menchaca v. Comm'r Soc. Sec. Admin.*, No. 6:15-cv-01470-HZ, 2016 WL 8677320, at *7 (D. Or. Oct. 7, 2016) (finding that the ALJ's determination that the plaintiff's symptoms were sometimes caused by situational stressors was reasonable and a legitimate reason to discount the plaintiff's credibility); *Chesler v. Colvin*, 649 F. App'x 631, 632 (9th Cir. 2016) (finding "the record supports the ALJ's conclusion that [the plaintiff's] mental health symptoms were situational, and so unlikely to persist once [the

plaintiff's] circumstances improved"). Accordingly, the Court finds that Plaintiff's overall improvement with treatment is a clear and convincing reason to discount Plaintiff's testimony.

C. Lack of Support from the Objective Medical Evidence

Under certain circumstances, the ALJ can discount a claimant's testimony when that testimony is not supported by the objective medical evidence. *See Batson,* 359 F.3d at 1196 (9th Cir. 2007) (consulting physician "did not believe that [the plaintiff's] 'graphic and expansive' pain symptoms could be explained on physical basis"); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (The ALJ could consider mild findings on MRIs and X-rays in discounting the plaintiff's testimony as to her back pain.). However, this may not be the ALJ's sole reason for discounting a claimant's testimony: "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick,* 157 F.3d at 722.

The ALJ found that "[t]he totality of the evidence is inconsistent with the degree of limitation alleged by the claimant." Tr. 29. Specifically, The ALJ emphasized that mental status exams in 2015 and 2016 were insignificant, and Plaintiff was cooperative at appointments and interacted without difficulty. Tr. 29. But in this case, Plaintiff alleges that her mental health conditions cause difficulties with concentration, leaving her house alone, and personal care. Consequently, Plaintiff's insignificant mental status exams—which largely indicate only that Plaintiff was cooperative, engaged, and displayed euthymic mood—do not conflict with her reported symptoms of anxiety and depression. Tr. 1295–1348; *see Ghanim*, 763 F.3d at 1164 (noting that "observations of cognitive functioning during therapy sessions [did] not contradict [the plaintiff's] reported symptoms of depression and social anxiety"). Accordingly, this is not a clear or convincing reason for discounting Plaintiff's subjective symptom testimony.

## II.    Medical Opinion Evidence

Plaintiff argues that the ALJ erred in discounting the opinion of Keli Dean, Psy.D, an examining medical source. Opinions regarding the ultimate issue of disability are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of an examining physician over that of a reviewing physician. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.*; *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. However, the ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Dr. Dean completed a psychological consultative examination of Plaintiff in November of 2013. Dr. Dean observed that Plaintiff appeared euthymic during the first part of the examination but became tearful and sad as she discussed her mental health history. Tr. 896. Dr. Dean administered the Montreal Cognitive Assessment ("MoCA") and found that Plaintiff's score "suggest[ed] the potential for cognitive impairment." Tr. 896. Among other things, Plaintiff was only able to recall three of five words after they were immediately presented, and two of five after a five-minute delay. Tr. 896. Dr. Dean found that her symptoms were consistent with her mental health records from Wildwood Psychiatric. Tr. 897–98. Plaintiff described symptoms of agoraphobia. Tr. 898. Dr. Dean also noted Plaintiff's history of suicidal thoughts. Tr. 898

In two forms provided by the Department of Human Services, Dr. Dean gave more detail as to Plaintiff's specific limitations. Dr. Dean found Plaintiff had moderate restrictions in her activities of daily living, including difficulties leaving her home without her family. Tr. 900. Dr. Dean also found that Plaintiff had mild restrictions in social functioning as she had become "increasingly withdrawn and uncomfortable with strangers." Tr. 900. Though Dr. Dean did not provide any specific indication as to the extent of Plaintiff's overall limitation in concentration, persistence, and pace, she indicated that Plaintiff's MoCA Score was "impaired" and more in-depth testing was recommended. Tr. 900. She also noted that depression and anxiety can cause problems with concentration, persistence, and pace. Tr. 900. Dr. Dean indicated that Plaintiff had "four or more" episodes of decompensation over a twelve-month period and would decompensate with even a minimal increase in mental demands. Tr. 901. Dr. Dean found marked limitations in Plaintiff's ability to complete a normal workweek or workday without interruptions from psychologically based symptoms and in her ability to travel to unfamiliar places or use public transit. Tr. 903. Dr. Dean found various other moderate limitations in areas such as social interaction, planning and goal-setting, maintaining concentration, maintaining a schedule and attendance, and working in proximity to others without distraction. Tr. 903

The ALJ gave partial weight to Dr. Dean's opinion for several reasons. First, the ALJ found that the opinion is "internally inconsistent" and "many of the findings are not supported by the record." Tr. 34. Specifically, the ALJ cited inconsistencies between Dr. Dean's finding of "moderate limitations in daily activities" and Plaintiff's ability to act as a homemaker and engage in other activities. Tr. 34. Second, the ALJ indicated that Dr. Dean's assessment of "mild limitations in social functioning" was inconsistent with her diagnosis of agoraphobia. Tr. 34. Third, she noted that Dr. Dean's findings of four or more episodes of decompensation were

"unsupported and unexplained by any objective evidence in the record" and demonstrated Dr. Dean's lack of familiarity with the agency's rules and regulations. Tr. 34. Fourth, the ALJ also noted that the file as a whole did not support Dr. Dean's finding that Plaintiff met the criteria for the effects of a residual disease process. Tr. 34. Fifth, the ALJ stated that Dr. Dean was "unable to assess concentration, persistence, and pace." Tr. 34.

The reasons provided for giving Dr. Dean's opinion partial weight are not specific and legitimate.[3] First, Plaintiff's ability to care for her children, do household chores, and provide transportation to family members are not inconsistent with Dr. Dean's assessed limitations in daily activities. As described above, both the record and Plaintiff's testimony at the hearing demonstrate that Plaintiff is limited in her ability to care for her children and do household chores and that she relies substantially on others for support. *See supra* Part I(A).

Second, mild limitations in social functioning are not inconsistent with a diagnosis of agoraphobia. As described by the DSM-5, "the essential feature of agoraphobia is marked, or intense, fear or anxiety triggered by the real or anticipated exposure to a wide range of situations." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 218 (5th ed. 2013). These situations include one or more of the following: "(1) Using public transportation; (2) Being in open spaces (e.g., automobiles, buses, trains, ships, planes);

---

[3] In her Reply, Plaintiff contends that the clear and convincing standard applies to the ALJ's decision because "[n]o conflicting mental opinion evidence exists aside from the state agency physicians and non-examining medical expert." Pl. Reply 8, ECF 16. The Ninth Circuit, however, has indicated that the opinion of a non-examining physician can establish a conflict among the medical opinions for the purposes of determining which standard is applicable to the ALJ's decision. *See Widmark v. Barnhart*, 454 F.3d 1063, 1066 & n.2 (9th Cir. 2006) (holding that ALJ had to provide specific, legitimate reasons supported by substantial evidence in the record to reject the treating physician's opinion which was contradicted by the opinion of a non-examining disability determination services physician; further noting that although the opinion of a non-examining physician "alone cannot constitute substantial evidence for rejecting" a treating physician's opinion, the non-examining physician's opinion can "suffice to establish a conflict among the medical opinions").

(3) Being in enclosed places (e.g. shops, theaters, cinemas); (4) Standing in line or being in a

crowd; or (5) Being outside of the home alone." *Id.* at 217. Among other things, these situations

almost always provoke fear or anxiety out of proportion to the actual danger posed by the

situation and "are actively avoided, require the presence of a companion, or are endured with

intense fear or anxiety." *Id.* at 218. This diagnosis does not conflict with Dr. Dean's finding that

Plaintiff has "mild" limitations in social functioning, defined as "the capacity to interact

appropriately, independently, and effectively with other individuals on a sustained basis." Tr.

900. Dr. Dean noted that Plaintiff "appears to be appropriate in her ability to act with others and

has one good friend," but "has become increasingly withdrawn and uncomfortable with

strangers." Tr. 900. In addition, when asked more specifically about Plaintiff's ability to interact

with others, Dr. Dean noted that she would be moderately limited in her ability to interact with

the general public and accept criticism from others but would have no significant limitation in

asking questions, getting along with co-workers, or maintaining socially appropriate behaviors.

Tr. 903. Accordingly, this is not a legitimate basis from which to discount Dr. Dean's opinion.

Third, the ALJ's discounting of Dr. Dean's finding as to the frequency of Plaintiff's

episodes of decompensation is not supported by substantial evidence. The ALJ stated that Dr.

Dean's determination that Plaintiff experienced four or more episodes of decompensation

demonstrate Dr. Dean's lack of familiarity with agency rules and regulations. This can be a valid

basis to discount a medical opinion under the regulations. 20 C.F.R. § 416.927(6) ("[T]he

amount of understanding of our disability programs and their evidentiary requirements that a

medical source has, regardless of the source of that understanding, and the extent to which a

medical source is familiar with the other information in your case record are relevant factors that

we will consider in deciding the weight to give to a medical opinion."). But in this instance, such

a finding is unsupported by the record. The form that Dr. Dean was given by the agency

provided a definition of "episodes of decompensation":

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. An episode is defined as lasting for at least two weeks. The frequency of episodes is measured over an inclusive 12-month period prior to assessment. More frequent episodes of shorter duration (less than 2 weeks) or less frequent episodes of longer duration (more than 2 weeks) may also be considered in addressing the degree of impairment. Episodes of decompensation may be inferred from medical records or other relevant information concerning the nature and extent of the claimant's impairment related signs and symptoms.

Tr. 900–01. This is similar to the definition of "episodes of decompensation" found in the Social

Security Listing of Impairments.[4] Contrary to the ALJ's finding, Dr. Dean was—at least with

regard to this particular issue—familiar with agency rules and regulations.

    In addition, the medical evidence supports Dr. Dean's finding that Plaintiff experienced

four or more episodes of decompensation in the preceding year. In November of 2012, Plaintiff

reported a rapidly increasing stress level, worsening depression, and difficulty motivating herself

to take care of her kids. Tr. 1060. Counseling records from January 17 through February 28,

2013, show Plaintiff had impaired memory, chronic impaired concentration, depression, severe

personal issues, and occasional suicidal thoughts. Tr. 1352–59. Plaintiff's mental health

---

[4] Listing 12.00 defines episodes of decompensation as:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Part 404, Subpt. P, App'x 1 § 12.00.

treatment records end in March of 2013, when Plaintiff lost her health insurance. Tr. 1350. But in November of 2013, she told Dr. Dean that she had suicidal ideation twice over the last six months. Tr. 894. At her evaluation, she also reported feeling "really, really, down" the past two weeks, like she wanted to "crawl in a hole." Tr. 896. She told her 19-year-old son that she would "end it all" if someone could take her kids. Tr. 896.  After her evaluation, she reported hopelessness, depression, and little reason to live, and she was referred to an intensive outpatient program at a local hospital. Tr. 1082–83. Taken together, Dr. Dean could reasonably conclude that Plaintiff had experienced at least four episodes of decompensation in the twelve months leading up to Plaintiff's examination.

Fourth, the ALJ erred in discounting Dr. Dean's finding that Plaintiff demonstrated a residual disease process "that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Tr. 901. Dr. Dean explained that Plaintiff "has multiple mental health and medical problems with problems with everyday functioning" and "[c]onsultation should occur with her treatment providers prior to increasing her demands." Tr. 901. Medical records from this period support this conclusion: Plaintiff's mental health symptoms worsened with an increase in personal stressors, including pregnancy, her husband's unemployment, marital issues, and stress in her home. *See e.g.* tr. 1362 (notes exacerbation of affective disorder due to postpartum status and multiple situational stressors).

Finally, the ALJ's finding that Dr. Dean could not assess concentration, persistence, and pace is not supported by the record. During the psycho-diagnostic evaluation, Dr. Dean administered the MoCA, which measures mental status and mild cognitive disfunction including limitations in concentration and attention. Tr. 896. Plaintiff's score suggested "the potential for

cognitive impairment." Tr. 896. Dr. Dean later explained: "[Plaintiff's] score fell in the impaired range – more in-depth testing is recommended to better understand CPP; however, depression and anxiety can cause problems in this area." Tr. 900. Ultimately, Dr. Dean found that Plaintiff was moderately limited in her "ability to maintain attention and concentration for extended periods." Tr. 903. Accordingly, contrary to the ALJ's assertion, Dr. Dean did asses Plaintiff's concentration and attention, determined that it was impaired, and suggested her impairment could be caused by her depression and anxiety.  As the ALJ's reasons are not specific and legitimate, the ALJ erred in giving little weight to Dr. Dean's opinion.

## III.    Other Source Evidence

Plaintiff also contends that the ALJ erred in giving little weight to the opinion of Jeremy Adversalo, a licensed professional counselor. Licensed professional counselors are not considered acceptable medical sources. *See Blodgett v. Comm'r Soc. Sec. Admin.*, 534 Fed. Appx. 608, 610 (9th Cir. July 23, 2013) (finding that the ALJ "properly accorded little weight to the 'other source' opinion[] of . . . a licensed professional counselor. . ."); *Georges v. Berryhill*, No. 6:17-cv-004750-HZ, 2018 WL 2080880, at *12 (D. Or. May 4, 2018) (holding that a licensed professional counselor and certified alcohol and drug counselor was not an acceptable medical source). Information from medical sources other than "acceptable medical sources" may provide insight into "the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p.  The ALJ must consider several factors when evaluating the opinion of such sources, including: (1) length of relationship and frequency of contact; (2) consistency of opinion with other evidence; (3) quality of source's explanation for opinion; (4) any specialty or expertise related to impairment; and (5) any other factors tending to support or refute the opinion. *See* SSR 06-03p; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Under Ninth Circuit law,

evidence from "other sources" is considered under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness. *Molina*, 674 F.3d at 1111 (because physician's assistant was not an acceptable medical source, ALJ could discount physician's assistant's opinion for germane reasons).

Mr. Adversalo saw Plaintiff on a bi-weekly basis beginning on September 13, 2015. Tr. 1318.[5] As of the date Mr. Adversalo completed the Mental Impairment Questionnaire, Plaintiff had diagnoses of "Bipolar II, Social Phobia, ADHD, Rule Out OCD, [and] PTSD." Tr. 1194. In a Mental Impairment Questionnaire, Mr. Adversalo found that Plaintiff had mild limitations in remembering procedures and maintaining attendance and moderate limitations in maintaining attention for two-hour segments, completing an eight-hour day without additional rest periods, and performing work without getting distracted. Tr. 1196. He did not find any limitations in understanding and remembering simple instructions or getting along with co-workers or members of the public. Tr. 1195–96. Mr. Adversalo opined that Plaintiff had a "residual disease process that would result in marginal adjustment that even a minimal increase in mental demands . . . would be predicted to cause the individual to decompensate" and "a history of 1 or more years [of] inability to function outside a highly supportive living arrangement[.]" Tr. 1197. He specifically indicated that Plaintiff's condition would be made worse if she were working full time. Tr. 1195. He also opined that Plaintiff would miss approximately two days of work per month. Tr. 1197.

The ALJ gave little weight to Mr. Adversalo's opinion because: (1) his report is internally inconsistent; (2) he does not explain his assessment or provide objective findings in support of his assessment; (3) his findings are inconsistent with her daily activities and treatment

---

[5] Plaintiff began treatment at Luke-Dorf—the facility where she saw Mr. Adversalo—with a different counselor beginning in December of 2013. Tr. 962.

records; and (4) he was not a long-term provider. Tr. 34. The ALJ also emphasized that Mr. Adversalo is "not an acceptable medical source" and "not familiar with the agency's rules and regulations." Tr. 34.

The ALJ has offered two germane reasons for discounting Mr. Adversalo's opinion.[6] First, the ALJ's finding that Mr. Adversalo's findings are unsupported by treatment records is supported by substantial evidence. Plaintiff's treatment records from Luke-Dorf generally provide very little information as to Plaintiff's symptoms and limitations, and during her treatment Plaintiff often reported that she was doing okay in managing her mental health condition. Tr. 1295–1342; *see also supra* Part I(B). Second, the form provided by Mr. Adversalo is a fairly cursory. It describes Plaintiff's limitations but provides no basis or explanation for those limitations. Taken together, these are germane reasons for discounting Mr. Adversalo's opinion. *See Batson*, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings."); *Cf. Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (The ALJ erred in rejecting the opinion of a physician because—though it was brief and conclusory—it was supported by the record as a whole.). Accordingly, the ALJ did not err in giving his opinion little weight.

## IV.     Remand for Further Proceedings

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has

---

[6] Because these are adequate reasons to discount Mr. Adversalo's opinion, the Court offers no opinion as to the remaining reasons provided by the ALJ.

three steps).  First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020.  Second, the record must be fully developed, and further administrative proceedings would serve no useful purpose. *Id.*  Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled.  *Id.*  To remand for an award of benefits, each part must be satisfied.  *Id.*; *see also Treichler*, 775 F.3d at 1101 (When all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule."). The "ordinary remand rule" is the proper course except in rare circumstances. *Treichler*, 775 F.3d at 1101.

The Court finds that the ordinary remand rule is the proper course in this case. First, Dr. Dean's opinion conflicts with other evidence in the record, including the reports of the state agency physicians and another examining psychologist. *See e.g.* tr. 112, 115–116, 623. Second, it is unclear what impact crediting Dr. Dean's opinion as true would have on the outcome in this case. Dr. Dean evaluated Plaintiff in November of 2013, but records from 2015 and 2016 show improvement in Plaintiff's condition. Accordingly, the Court remands this case for further proceedings.

///

///

///

///

///

///

///

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for further administrative proceedings.

IT IS SO ORDERED.


Dated this \_\_21\_\_\_ day of January, 2019.


_____
MARCO A. HERNÁNDEZ
United States District Judge